# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT



FILED

NOV 17 2004

CLERK

---

No. 03-3529

---

| | | |
|---|---|---|
| Jerry W. Bender, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Eugene Regier, M.D., | * | |
| | * | |
| Defendant - Appellant, | * | |

---

Submitted: May 11, 2004
Filed: October 1, 2004

---

Before LOKEN, Chief Judge, BRIGHT and SMITH, Circuit Judges.

---

LOKEN, Chief Judge.

In July 1998, while incarcerated in the South Dakota corrections system, Jerry Bender tested positive for the Hepatitis C virus (HCV). In this action under 42 U.S.C. § 1983, Bender alleges that Eugene Regier, a physician employed by the South Dakota Department of Health, violated Bender's Eighth Amendment rights by failing to treat his HCV with interferon before Bender's release from the South Dakota State Penitentiary in February 2003. Regier appeals the denial of his motion for summary judgment on qualified immunity grounds. Concluding that Bender failed to present evidence that Dr. Regier acted with deliberate indifference, the criminal law recklessness necessary to prove an Eighth Amendment violation, we reverse.

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans

## I. Background.

**Hepatitis C and Interferon.**  The virus causing Hepatitis C was identified a little more than ten years ago.  HCV primarily attacks the liver.  More than half of those infected develop chronic liver inflammation and after many years of progressive deterioration some develop cirrhosis and end-stage liver disease, which can be fatal. A well-respected study found that, in the twenty-five years following initial infection, twenty percent of those exposed to HCV develop cirrhosis and three to five percent develop fatal complications such as liver cancer.  See Scott A. Allen et al., Hepatitis C Among Offenders, 67 FED. PROBATION 22, 22 (2003).  About forty percent of Americans infected with HCV reside in correctional institutions.  Id. at 24.

Synthetic interferon was released to the market some ten years ago.  Until then, no treatment for the Hepatitis C virus existed.  By January 2002, a more effective interferon treatment was available, involving a combination of pegylated interferon (interferon with polyethylene glycol) and ribavarin.  Interferon treatment has serious potential side-effects, including nausea, anemia, depression, and decomposition of the liver.  Its success rate is relatively low -- 15-30% for regular interferon and 40-50% for pegylated interferon treatment.  The selection of patients for interferon treatment is highly individualized and depends upon many factors.  Treatment is not appropriate for patients with advanced liver problems such as cirrhosis.  Treatment for patients with mild liver problems may be safely deferred.  Suitability for treatment is determined by measuring the degree of liver inflamation and fibrosis through a liver biopsy.  However, even if the appropriate threshold levels of inflammation and fibrosis are present, treatment may be inappropriate if the patient is too young or too old, had a previous organ transplant, or suffers from depression, other mental health problems, heart disease, or untreated chemical dependency.  Pegylated interferon treatment involves a series of injections for six months to a year at a cost of $2,000 per month.

**Dr. Regier's Treatment of Bender.**  Dr. Regier practiced family medicine for thirty years before beginning to treat South Dakota inmates in 1996.  He began treating Bender for various medical problems in March 2000.  Dr. Regier continued to monitor the levels of a liver enzyme known as ALT that indicates liver cell damage, as prison physicians had done since discovering Bender's HCV infection in mid-1998.  Regier also ordered blood tests to determine Bender's HCV genotype.

Bender was released from prison in May 2000.  But he was reincarcerated in December 2000 after violating his parole by using marijuana and methamphetamine. In March 2001, with Bender's ALT levels continuing to show the presence of HCV, Dr. Regier discussed the possibility of interferon treatment with Bender and referred him to Dr. Robert D. Meyer, a South Dakota gastroenterologist and noted HCV specialist.  Dr. Meyer examined Bender in May.  Also in May, the prison system changed health care providers, choosing a prison managed health care plan under the direction of a non-practicing physician, Dr. Michael Rost.  In August, Dr. Regier requested a "consult with Robert Meyer, MD, in regard to doing liver biopsy."  Dr. Meyer met with Bender in September 2001, discussed interferon treatment with him, and arranged for a liver biopsy.

The biopsy was performed in mid-October.  Meyer and Regier received copies of the liver pathology report, which stated that Bender's status was "Grade 3" inflammation and "Stage 1" fibrosis.  Dr. Regier's November 21, 2001, Progress Note states: "Regarding the hepatitis C situation, the patient has had consultation with Dr. Robert Meyer and we are awaiting word from Dr. Meyer regarding possibly starting this patient on [interferon] treatment."  However, Meyer never prescribed or recommended interferon treatment for Bender.  Both Meyer and Regier testified that they never discussed interferon treatment for Bender (or any other HCV-infected inmate).  Dr. Meyer testified that his only discussion with Dr. Regier after Bender's liver biopsy concerned "when a decision would be made" about interferon treatment for South Dakota inmates generally.  He further testified that, in retrospect, Bender

-3-

"was somebody I would treat" because of his Grade 3 inflammation and Stage 1 fibrosis levels. After November 2001, Dr. Regier continued to treat Bender on a regular basis but did not prescribe or order interferon treatment.

**Who Was in Charge?**  Dr. Meyer testified that he did not have the authority to schedule an inmate for interferon treatment without approval by "someone at the South Dakota State Penitentiary." But the director of the health care plan, Dr. Rost, testified that once an inmate with HCV was referred to a treating specialist, such as Dr. Meyer, "[i]f he decided the person needed a liver biopsy, he doesn't have to call me. If he decided the person needed interferon, he doesn't have to call us. He just writes the order for it." On the other hand, Rost explained, Dr. Regier was a staff physician, not a HCV specialist. Therefore, "if Dr. Regier wanted to use interferon, he would request that through my office." In response to a question by Bender's attorney, Rost testified:

> Q. So your understanding is Dr. Meyer would have unfettered freedom to order interferon treatment for a prisoner if he was referred by you for examining a prisoner for hepatitis C?
>
> A. I would have no problem. If the doctor had ordered that material for someone, we would have filled the prescription.

At his deposition, Dr. Regier was asked, "Why were you awaiting word from Dr. Meyer as to whether or when pegylated interferon would be available to him?" Regier responded: "At that time it was not known by me whether or not treating patients with interferon was a possibility and who would qualify for it since I did not have a protocol in my hands from the South Dakota Department of Health." The subject was again addressed a short time later in the deposition:

-4-

Q. Well, is it fair to say you never contacted Dr Meyer and said, "Go ahead and order it and start the [interferon] treatments with Mr. Schnetter" [another HCV-infected inmate]?

A. That would be correct. I never did . . . .

Q. Why not?

A. As I stated before, I did not have a protocol in place and it was not a medication that I felt I had the privilege of ordering without getting approval from the managed care people . . . .

**The Department of Health Develops a Protocol.** At a meeting early in 2002, representatives of the Department of Corrections and the Department of Health noted the increase in HCV-infected inmates and asked Dr. Rost to develop a protocol that would determine, in Dr. Rost's words, "what the criteria should be . . . that would render someone eligible for treatment and then what were all the complicating issues that might interfere with the success of the treatment and/or the ability of the inmate to complete the process." A committee was formed and contacted several midwestern States that had developed HCV treatment protocols. After visiting a Minnesota prison, the committee determined that the Minnesota protocol was a suitable model and then adapted that model to South Dakota prison procedures.

The South Dakota Department of Health adopted its Correctional Health Care Protocol for the Treatment of Offenders Infected with the Hepatitis C Virus in September 2002. Bender was still incarcerated, but he was ineligible for interferon treatment under the protocol's eligibility criteria because his liver biopsy did not demonstrate at least Grade 2 and Stage 2 inflammation and fibrosis, and because he did not have eighteen months remaining on his sentence to complete the treatment process. In addition, the protocol provides that "[t]he offender should be free of

-5-

alcohol or non-prescribed drug use." The summary judgment record establishes that Bender is a chronic drug and alcohol abuser.

**The District Court's Decision.** The district court first concluded that Bender had a serious medical need for interferon treatment because, at his deposition, "Dr. Meyer stated that he would treat Bender with interferon." The court then concluded that the summary judgment record would permit an inference that Dr. Regier acted with deliberate indifference because Dr. Regier knew of the seriousness of HCV and "has not demonstrated that he made a medical judgment to withhold treatment."

## II. Analysis.

Prison doctors and guards violate the Eighth Amendment when they act with "deliberate indifference to [an inmate's] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Deliberate indifference" entails a level of culpability equal to the criminal law definition of recklessness, that is, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Estelle, 429 U.S at 106. Likewise, an inmate's "mere disagreement with the course of his medical treatment" fails to state a claim of deliberate indifference. Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990); see Dulany v. Carnahan, 132 F.3d 1234, 1239-44 (8th Cir. 1997).

**Serious Medical Need.** In this case, as the district court recognized, though an HCV infection is unquestionably a serious medical problem, the Eighth Amendment issue is not whether the infection itself is a "serious medical need," but rather whether Bender had a serious medical need for prompt interferon treatment. The district court concluded that Bender satisfied this aspect of the Estelle analysis

-6-

because Dr. Meyer opined, as a matter of hindsight, that he would treat someone with Grade 3 inflammation and Stage 1 fibrosis. Given the evidence that Bender was an unsuitable candidate for interferon treatment for other reasons -- Dr. Meyer agreed that interferon patients "should be free of alcohol or chemical dependency" -- we doubt whether Meyer's hypothetical opinion is an adequate basis to defeat the claim of qualified immunity on this ground. But we need not decide that issue because Bender failed to prove that Dr. Regier acted with deliberate indifference.

**Deliberate Indifference.** It is uncontroverted that Dr. Regier treated Bender's medical needs including his HCV condition for many months. Dr. Regier's progress notes reflect that he monitored and charted Bender's ALT levels, ordered genotype testing of his HCV, counseled Bender regarding use of pain medications that can adversely affect the liver, and prescribed anti-oxidant vitamins. When tests in early 2001 confirmed that Bender was not clearing the virus on his own (as many infected persons do), Regier referred Bender to an eminent HCV specialist, authorized a liver biopsy, discussed interferon treatment with Bender, and then waited for Dr. Meyer's recommendation.

We disagree with the district court's conclusion that Dr. Regier offered no evidence that he made a medical judgment to withhold interferon treatment. Dr. Regier's background was in family medicine, not gastroenterology. Having referred Bender to a specialist, who then became the primary treating physician, Regier was justified in leaving the interferon treatment decision to Dr. Meyer, or at least in waiting for Dr. Meyer's recommendation. Moreover, Regier believed that he lacked authority to order interferon treatment without a Department of Health protocol establishing eligibility criteria. Regier was not responsible for the absence of a protocol. Having referred Bender to a specialist, and lacking personal knowledge that Bender faced a medical emergency, Regier's belief that he could not or should not act unilaterally without a protocol was not unreasonable.

-7-

The summary judgment record does reflect confusion or miscommunication among the medical professionals while the Department of Health protocol was being developed. Dr. Meyer's deposition testimony suggests that he believed Bender should be treated but waited for word that interferon treatments would be approved. Dr. Regier testified, consistent with his progress note, that he was waiting for Dr. Meyer to recommend or order interferon treatment for Bender. Dr. Rost testified that interferon treatment would have been approved despite the absence of a protocol if a treating specialist like Dr. Meyer had ordered it. This confusion does not establish an Eighth Amendment violation; "an inadvertent failure to provide adequate medical care" is simply not a constitutional violation. Estelle, 429 U.S. at 105. Given the uncontroverted evidence that Dr. Regier treated Bender's HCV condition for many months and then referred him to an appropriate specialist, any subsequent confusion or miscommunication between Meyer and Regier about the ordering of interferon treatment is at most evidence of negligence, not deliberate indifference, on the part of Dr. Regier.

Paragraph 3 of the district court's order dated September 29, 2003, is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

BRIGHT, Circuit Judge, dissenting.

I dissent. This is a close and difficult case. Whether or not Dr. Regier is entitled to be relieved of liability at this summary judgment stage rests in part on inferences to be gleaned from the evidence introduced in the case.

The district court in denying summary judgment to Dr. Regier stated:

> Although Dr. Regier actively consulted with Bender and treated his Hepatitis, Dr. Regier has not provided evidence that denying Interferon treatment was a reasonable response to Bender's Hepatitis.

-8-

Dr. Meyer stated that he would have provided Interferon treatment to Bender. (Meyer Depo. at 54-55). Defendants do not present any medical evidence that there were reasons to withhold this treatment.[] Because Dr. Regier has not identified in the record any reasons why Bender is not a candidate for Interferon treatment, Dr. Regier has not demonstrated that he made a medical judgment to withhold treatment. The Court acknowledges that mere negligence "does not state a valid claim of medical mistreatment under the Eighth Amendment." Estelle, 429 U.S. at 106. In construing the facts in the light most favorable to the Plaintiff, Dr. Regier's conduct demonstrates he knew of the seriousness of Hepatitis. Plaintiff is entitled to a jury trial on the issue of whether Dr. Regier's failure to treat Bender was a "reckless disregard of the known risks." Moore v. Duffy, 255 F.3d at 545. Therefore, Dr. Regier is not entitled to summary judgment on the merits of this claim.

Appellant's Add. at 11 (footnote omitted).

I believe that the district court's ruling denying summary judgment should be sustained on this appeal. I do not intimate that liability exists against Dr. Regier, but only that Plaintiff Bender can proceed with this litigation.

---